1   JULIANA DROUS
    Attorney at Law, SBN 92156
2   214 Duboce Avenue
    San Francisco, CA  94103
3   Telephone (415) 863-3580
    Facsimile (415) 255-8631
4   jdrous@msn.com

5   Attorney for Petitioner
    KRISTI LYN LUNBERY
6

7

8

9               UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11

12  KRISTI LYN LUNBERY,                    )        No.
                                           )
13                  Petitioner,            )        PETITION FOR WRIT
                                           )        OF HABEAS CORPUS
14          vs.                            )        BY PERSON IN STATE
                                           )        CUSTODY
15  TINA HORNBEAK, Warden,                 )        (28 U.S.C. § 2254)
    and THE ATTORNEY GENERAL OF THE        )
16  STATE OF CALIFORNIA                    )
                                           )
17                  Respondents.           )
    _____    )

18

19          Petitioner Kristi Lunbery, by and through counsel, petitions for a Writ of Habeas Corpus

20  pursuant to 28 U.S.C. § 2254 and by this verified petition states as follows:

21                                         I.

22          This case arises out of the Fifth, Sixth, and Fourteenth Amendments of the United States

23  Constitution.  This Court has jurisdiction to entertain this application for a writ of habeas corpus

24  pursuant to 28 U.S.C. § 2254.

25                                         II.

26          Petitioner is unlawfully incarcerated and restrained at Valley Stare Prison for Women, in

27  Chowchilla, California, by respondent Tina Hornbeak, Warden.

28                                         III.

            Petitioner is confined pursuant to a judgement of the Shasta County Superior Court, Reading,

California, case number 01F8979, rendered on May 14, 2004.

IV.

On May 14, 2002, a complaint was filed in the Shasta County Superior Court charging petitioner with the murder of her husband, Charles Bateson. (Cal. Pen. Code § 187, subd. (a).) It was also alleged that she personally used a firearm in the commission of the offense. (Cal. Pen. Code § 12022.5. The complaint was deemed the information afer counsel waived petitioner's right to a preliminary hearing.

III.

On April 8, 2004, a jury returned verdicts finding petitioner guilty of murder in the second degree and finding the weapon allegation true. On May 14, 2004, petitioner was sentenced to 19 years to life imprisonment. The court imposed 15 years to life for second degree murder, plus four years for personal use of a firearm. The judgement was affirmed by the Third District Court of Appeal in an unpublished decision filed on June 20, 2005. (Exhibit A.) Review was denied by the California Supreme Court on September 21, 2005.

IV.

On December 7, 2006, petitioner filed a petition for writ of habeas corpus in the California Supreme Court. (California Supreme Court number S148599.) The petition was denied.

.                                                  V.

Petitioner is actually innocent of the charge for which she was convicted. This petition arises out of the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution. As a result of erroneous rulings of the trial court and ineffective assistance of counsel, petitioner was denied her fundamental rights to the effective assistance of counsel, to present a defense at trial, and to a fundamentally fair trial.

VI.

Petitioner and Charles Bateson were married in 1988. At the time of Mr. Bateson's death, they had two daughters, ages five months and three years. In early April, 1992, the family moved into a small, one-bedroom home owned by petitioner's grandmother, Margaret Beaman, at 2292 Fir Street in Burney, California, in order to save money to purchase their own home.

1        On April 17, 1992, Mr. Bateson, after working the night shift at the Sierra Pacific Mill, came

2   home at about 3:00 or 4:00 a.m., and slept on a hide-away bed in the living room.  After his children

3   awoke, at about 6:00 or 6:30 a.m., he moved into the bedroom.  It was common for petitioner to take

4   the children out of the house, so as not to disturb their father's sleep.  On this day, she and the

5   children left the house at about 8:00 a.m.  Before leaving she left a note telling Mr. Bateson that she

6   and the children were going into Redding.

7        Before driving to Redding, petitioner took the family dog to her parents' home.  Her parents

8   were not there, but her grandfather, Claire Conley was in the house.  After putting the dog in the

9   backyard, and briefly speaking to her grandfather, she left her parents' house and drove to Redding.

10   In Redding, petitioner took her children to a playground.  A short time later, she, with her children,

11   drove to Mount Shasta Mall.   She got to the mall at about 9:00 a.m.  At the mall she met up with

12   her grandfather.

13        When she left the mall, and walked to the parking lot to drive home, she saw she had a flat

14   tire.  She tried calling her husband to ask him to come and help her.  The phone was not answered

15   at her house, so she decided to walk around a while longer in the mall, and then try to call again.

16   When she called the second time, again there was no answer.  She decided to call a friend, Belinda

17   Strickland, to ask her to go to the house and tell Mr. Bateson she needed his help to fix the tire.

18        When Ms. Strickland went to the Fir Street house, after receiving no response to her knock

19   on the door and her yell, she entered the house through the unlocked front door.  She opened the

20   bedroom door, and found Mr. Bateson's body lying on the bed.  He had been shot once, at close

21   range.  He died of a single gunshot wound.

22        Petitioner's grandmother, Ethyl Miles, came to the mall, to find petitioner.  When she told

23   petitioner that Mr. Bateson had been shot, petitioner fainted.

24        Ten years later, in 2002, deputy sheriff Steve Grashoff, who sometimes was assigned "cold

25   cases," decided to interview petitioner.  He, along with another deputy sheriff, Cliff Blankenship,

26   went to petitioner's home to get a confession.  They interviewed petitioner for about an hour and a

27   half.  The first hour was devoted to re-reviewing the facts, and the final half-hour to leaning heavily

28   on her to confess.  At the end of the interview, she confessed to killing her husband with his rifle,

1  but said she did not remember what she did with the weapon.

2      At the hearing on a motion to suppress the confession, petitioner testified she was feeling

3  stressed when Officer Grashoff started accusing her of killing her husband.  The stress was further

4  exacerbated by her need to take care of a severely retarded 47 year old man for whom she was a

5  caretaker.   After the officer persistently referred to her children, during the latter part of the

6  interview, she felt overwhelmed, frightened and nervous.  She thought the officers would take her

7  children away from her if she did not tell them what they wanted to hear.  She admitted shooting Mr.

8  Bateson only because she thought that was what the officers wanted to hear.

9                                          VII.

10     Petitioner did not receive the effective assistance of counsel to which she is constitutionally

11 entitled under the Sixth and Fourteenth Amendments to the United States Constitution.  The only

12 evidence presented at trial which connected her to the crime was the confession.  Trial counsel

13 rendered ineffective assistance by failing to present evidence that was material regarding the

14 reliability of the confession.  Dr. Richard Ofshe was available to testify and would have explained

15 that innocent people do in fact confess to crimes, even murders, which they did not commit, and the

16 reasons they do so.

17                                        VIII.

18     Petitioner was further denied her Sixth and Fourteenth Amendment rights to present a

19 defense and to a fundamentally fair trial by the trial court's ruling that evidence of third party

20 culpability could not be admitted at her trial.  Petitioner proffered to prove that:

21     Frank Delgado, a drug dealer, lived in the Fir Street residence, and had been evicted by

22 petitioner's grandmother just before petitioner and her family moved in.

23     A Ford Fiesta which had connections to bother Delgado and a man named Henry Garza had

24 been seen in front of the residence a week before the homicide, and was briefly parked there again

25 in the very early hours of the day of the homicide.  Delgado was known to have burned Garza in a

26 drug deal.  After the homicide, Garza was overheard saying, "That is a bummer. My partner blew

27 away the wrong dude."  In addition, an informant told a Shasta County Sheriff Detective that the

28 killing of Mr. Bateson was a mistake, and that the intended victim was Frank Delgado because

1   Delgado had "ripped off several people in town over drug dealings."

2        Moreover, finger and palm prints were lifted from the murder scene that did not match any

3   of the exemplars from people who would have been in the residence in the recent past.  There were

4   also two weapons not connected to petitioner that could not be ruled out as the murder weapon.

5                                                    IX

6        Petitioner was also denied her Sixth Amendment rights to a fair trial and to present a defense

7   at her trial, in that the state failed to preserve information regarding the identity of the confidential

8   informant who told a Shasta County Sheriff Detective that the killing of Mr. Bateson was a case of

9   mistaken identity, and that the intended victim was Frank Delgado.  The informant stated that

10  Delgado had a number of enemies, and offered possible suspects, including Henry Garza.

11       When petitioner moved for disclosure of the identity of confidential informants, information

12  pertaining to only one of the informants was turned over.  As to the other informant, it was disclosed

13  that the detective who interviewed that informant had no current recollection of the informant's

14  identity, and that although his practice was to record the informant's name and address in a field

15  notebook, he could no longer find that material.

16       The trial court denied a motion to dismiss the charges for loss of material exculpatory

17  evidence.  When petitioner renewed her motion at the start of trial, she requested that she be allowed

18  to introduce the informant's statement or that the prosecution failed to preserve the identifying

19  information of the confidential informant.   The trial court's failure to impose proper sanctions on

20  the prosecution for the loss of the evidence denied petitioner her Sixth Amendment right to a fair

21  trial.

22                                                    X.

23       Petitioner was further denied her Sixth Amendment right to a fair trial  as a result of the trial

24  court's failure to admonish the jury following prosecutorial misconduct by misstating the law to the

25  jury.  The thrust of the defense was that petitioner's character rendered it extremely unlikely that she

26  would have committed the offense, that she had no motive to do so, and that there was no physical

27  or scientific evidence linking her to it, and that her confession was false, coming as the result of

28  coercion, pressure, and scare tactics by Deputy Grashoff.  Trial counsel's argument was substantially

                                                    5

1    undercut when the prosecutor told the jury, "You would never have heard that interview if it was

2    a coercive interview." At the recess which immediately followed, petitioner objected, and requested

3    a curative admonition. The trial court agreed that the jurors could draw an improper inference from

4    the prosecutor's remark that the confession was found to be reliable by the court, and could result

5    in the jury being misled about its role in determining the issue regarding the reliability of the

6    confession, but declined to admonish the jury.

7 XI.

8       The admission of the confession violated the Fifth and Fourteenth Amendment which bars

9    the prosecution from using an involuntary confession.

10       Detective Grashoff admitted that when he went to petitioner's residence, he had no evidence

11    that petitioner was responsible for the killing of her husband and that the purpose of the visit was to

12    secure a confession from her. He spent the first hour with general questioning and review. He then

13    went on the offense, accusing her of inconsistency, referring to an FBI profile indicating her guilt

14    ("everything comes back at you, Kristi"), and repeatedly telling her, he and his partner knew she was

15    guilty, and inferring that she would get more lenient treatment if she confessed. The officer also

16    used her children to obtain the confession, telling petitioner, "you don't want this thing to bite you

17    in the butt on down the road with your kids," and implied that if she confessed, she would not lose

18    her children, but if she did not confess, "they're going to take you away from your kids." After being

19    threatened with the loss of her children, petitioner confessed, telling the officers what they wanted

20    to hear.

21       Petitioner provided no information in the confession not previously generally known, and

22    adopted the officer's suggestion that the reason she killed her husband was that he was controlling.

23    She could not provide any information regarding the whereabouts of the weapon.

24 XII.

25       This petition has been filed as soon as practicable after all of the facts alleged as grounds

26    herein became known to undersigned counsel, and as soon as practicable after these facts became

27    known to petitioner.

28

6

XIII.

Petitioner has no other adequate remedy at law.

XIV.

Each of the claims raised herein has been adjudicated in state court proceedings, and the adjudication of each claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, as defined in 28 U.S.C. §2254(d)(1).

XI.

Petitioner incorporates by reference into this petition the accompanying points and authorities and factual allegations contained therein, as well as the exhibits to this petition.

XII.

Petitioner has no plain, speedy and adequate remedy to obtain his immediate release.

WHEREFORE, petitioner respectfully requests that this Court:

1.     Take judicial notice of all of the record on appeal and all documents filed in Shasta County Superior Court case number 01F8979 and Third District Court of Appeal case number C046943;

2.     Issue its writ of habeas corpus or order to show cause to the Attorney General of California to inquire into the lawfulness of petitioner's convictions;

3.     Order an evidentiary hearing;

4.     Set aside petitioner's convictions;

5.     Appoint counsel for petitioner who is indigent;

6.     Grant petitioner whatever further relief is appropriate in the interest of justice.

Dated:                                         Respectfully submitted,


                                               _____/s/_____
                                               JULIANA DROUS
                                               Attorney for Petitioner
                                               KRISTI LYN LUNBERY

1

### VERIFICATION

2      I am an attorney admitted to practice before the Federal District Court for the Northern

3  District of California and have my office in San Francisco County.  I am the attorney for petitioner

4  herein, restrained of her liberty and confined at Valley State Prison for Women, in Chowchilla,

5  California, by Tina Hornbeak, Warden.  I am authorized to file this Petition.

6      Petitioner is unable to make this verification because she is absent from San Francisco

7  County, and presently confined.  For that reason I make this verification on her behalf.  I have read

8  the foregoing Petition for a Writ of Habeas Corpus and the Memorandum in support thereof I believe

9  the matters therein are accurate.

10      I certify under penalty of perjury that the foregoing is true and correct.

11      Executed at San Francisco, California, on April 27, 2007

12

13                                    _____/s/_____

14                                    JULIANA DROUS

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
## OF PETITION FOR WRIT OF HABEAS CORPUS

3

4

### INTRODUCTION

5

6

7

8

9

10

11

_____On April 17, 1992, Charles Bateson was killed in the bedroom of his home.  Ten years later, Deputy Sheriff Steve Grashoff, having been assigned a "cold case," went to petitioner Kristi Lunbery's home to obtain her confession.  Petitioner confessed after the culmination of a lengthy interview under stressful circumstances, in which premises of leniency, threats of loss of her children, and false statements concerning the evidence against her were made.  The trial court failed to exclude the confession as involuntary under the totality of the circumstances, and then failed to appropriately admonish the jury after the district attorney committed misconduct by telling the jury that if the confession was unreliable, the jury would never have heard it.

12

13

14

15

16

17

18

Petitioner was convicted after a trial where the only evidence connecting her to the killing of her husband was her confession.  At trial, defense counsel failed to present evidence  to answer the question, "why would someone confess to a killing she did not commit?"  In addition, the trial court did not allow petitioner to present evidence of third party culpability, did nothing after the district attorney committed misconduct, and imposed no sanctions on the state for the loss of information concerning the identity of an informant who had information relevant to the defense that someone other than petitioner killed Mr. Bateson.

19

20

21

22

23

At trial the combination of ineffective assistance of counsel and erroneous rulings by the trial court banning evidence of third party culpability and failing to admonish the jury after the prosecutor committed misconduct by telling the jury that the confession would not have been allowed to be admitted as evidence if it had been found to be unreliable, denied petitioner her fundamental Sixth and Fourteenth Amendment rights to counsel, to present a defense, and to a fundamentally fair trial.

24

### STATEMENT OF FACTS

25

26

27

28

Petitioner Kristi Lunbery and Charles Bateson were married in 1988, when she was 18 and Mr. Bateson was 20.  (RT 836, 839.)  At the time of the homicide, they had two daughters, ages five months and three years.  (RT 255.)  About two weeks before Mr. Bateson was killed, they had moved into a small house at 2292 Fir Street owned by petitioner's grandmother.  They had planned

1  on saving money (they were charged no rent by her grandmother) in order to purchase a home of

2  their own.  (RT 259, 297, 303, 678, 701.)

3      Mr. Bateson was employed at the Sierra Pacific Mill just outside Burney, and worked from

4  5:00 p.m. until 3:00 a.m.  (RT 260, 853.)  When he arrived home, he would sleep with petitioner on

5  a hide-away bed in the living room until the children, who occupied the bedroom, were awake.  Then

6  he would move into the bedroom.  (CT 604-605.)  To allow him to rest, petitioner would routinely

7  leave the home between 7:30 and 8:30 a.m., with the children and the family dog.  (RT 832.)

8      On April 17, 1992, Mr. Bateson returned from work sometime between 3:00 and 4:00 a.m.

9  (RT 853.)  Petitioner's girls awoke about 6:00 or 6:30 a.m.  At about 7:40 a.m., after feeding and

10  dressing her daughters, she took them to the Mt. Shasta Mall in Redding, first stopping at her

11  parents' home to drop her dog off, and then stopping briefly at a park so her older daughter could

12  play.  (RT 855-861.)

13      Petitioner then took her children to the Mount Shasta Mall and walked around the mall for

14  a while.  At the mall, she met up with her grandfather.  Upon returning to her car, she noticed her car

15  had a flat tire.  (RT 862-863.)  Petitioner went back into the mall and tried twice to call her husband,

16  but no one answered the phone.  She then called a friend, Belinda Strickland, and asked her to go

17  to the house to wake Mr. Bateson and get him to come to the mall to help her with the flat tire.  (RT

18  865-866.)

19      Strickland went to the home, and as there was no answer to either her knock or yell, entered

20  through the unlocked front door.  (RT 289-291.)  When she opened the bedroom door she found

21  Bateson's body lying on the bed.  (RT 292-293.)  He had been shot once, at close range.  (RT 346-

22  349, 352, 381.)

23      The bullet which killed him was a .30 caliber, consistent with at least 27 different weapons,

24  the seven commonest of which included a Winchester Model 94 .30-.30 rifle.  (RT 553-555, 561,

25  563.)  Bateson had owned a lever action .30-.30 Winchester rifle, which was not found after the

26  shooting.  (RT 255.)  There was blood on the outward facing portion of the bedroom door and on

27  the outer edge of the doorway, suggesting the door was open to some extent when the shot was fired.

28  (RT 315-316.)

A deputy sheriff located petitioner at the mall security office with her grandfather and her two small children. (RT 385.) She became visibly upset when told her husband was dead. (RT 412.) The deputy sheriff went out to the parking lot, and noted that the left front tire of her car was flat. Broken glass was found in front of it and was imbedded in the tread. (RT 388-389.) Her car was searched. No weapon was found and no blood was noted in the car. (RT 415.) Petitioner had no blood on her clothing. (RT 397.)

Petitioner was interviewed by deputy sheriffs that afternoon. (RT 391, 422.) She stated that her husband was asleep when she left home about 8:00 a.m. with her two children. She took her dog to her parents' home, and told her grandfather she was going to the mall. She tried calling home after she discovered she had the flat tire. (CT 572, 601, 607.)

In 2002, Deputy Sheriff Steve Grashoff, who was assigned "cold cases," decided to interview petitioner again. (RT 520-521.) He and another deputy went to petitioner's home to get her confession. (RT 527.) After approximately one and a half hours, the final half-hour being devoted to leaning heavily on petitioner to confess (CT 175-183), petitioner told the officers that she killed her husband with his rifle. (CT 184.)

**ARGUMENT**

**I.    PETITIONER'S CONVICTION MUST BE SET ASIDE BECAUSE TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO PRESENT EXPERT TESTIMONY EXPLAINING WHY A PERSON WOULD CONFESS TO A CRIME SHE DID NOT COMMIT.**

The state's only evidence at trial connecting petitioner to the homicide was petitioner's confession. Though trial counsel had available the testimony of Dr. Richard Ofshe, Ph.D., he failed to call him to testify at petitioner's trial, to explain to the jury that innocent people do in fact confess to crimes they do not commit. The failure of trial counsel to call Dr. Ofshe as a witness at petitioner's trial constituted ineffective assistance of counsel and denied petitioner the only defense she had.

The right to effective assistance of counsel is fundamental:

> [A] fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceedings. The right to counsel plays a crucial role in the adversarial system embodied by the Sixth Amendment, since access to counsel's skill and knowledge is

1

necessary to accord defendants the "ample opportunity to meet the case of the prosecution" to which they are entitled.

2

*Strickland v. Washington*, 466 U.S. 668, 685 (1984).

3

4

The Sixth Amendment

5

envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.

6

7

*Id.*

8

The decisions of the United States Supreme Court have emphasized that the Sixth

9

Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." *Id.* at

10

684; *Nix v. Whiteside*, 475 U.S. 157, 175 (1986) [noting that under *Strickland*, the "benchmark" of

11

the right to counsel is the "fairness of the adversary proceeding"); *United States v. Cronic*, 466 U.S.

12

648, 653 (1984) ["Without counsel, the right to a trial itself would be of little avail"]; *United States*

13

*v. Morrison*, 449 U.S. 361, 364 (1981)[the right to counsel "is meant to assure fairness in the

14

adversary criminal process"].

15

**A.    The Psychological Environment That Yielded The Confession Was Of Substantial Relevance To The Factual Issue Of Petitioner's Guilt Or Innocence.**

16

17

It is by now well established that "certain interrogation techniques, either in isolation, or as

18

applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of

19

justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment."

20

*Crane v. Kentucky*, 476 U.S. 683, 687, (1986) quoting, *Miller v. Fenton*, 474 U.S. 104, 109 (1985).

21

To assure that the fruits of such techniques are never used to secure a conviction, due process also

22

requires that a jury not hear a confession unless and until the trial judge, or some other independent

23

decisionmaker, has determined that it was freely and voluntarily given. *Crane v. Kentucky*, at 688;

24

see also, *Sims v. Georgia*, 385 U.S. 538, 543-544 (1967); *Jackson v. Denno*, 378 U.S. 368 (1964).

25

It has never been questioned that "evidence surrounding the making of a confession bears on

26

its credibility" as well as its voluntariness. Confessions, even those that have been found to be

27

voluntary, are not conclusive of guilt, since, as with any other part of the prosecutor's case, a

28

confession may be shown to be insufficiently corroborated or otherwise unworthy of belief. (*Crane*

12

1    *v. Kentucky,* 476 U.S. at 688; *Lego v. Twomey*, 404 U.S. 477, 485-486 (1972); *Jackson v. Denno*,

2    378 U.S. at 386, n. 13.

3        In *Crane v. Kentucky*, the Supreme Court held that the exclusion of competent, reliable

4    evidence bearing on the credibility of a confession, when such evidence is central to a criminal

5    defendant's claim of innocence, deprives the defendant of the basic right to have the prosecutor's case

6    encounter and survive the crucible of meaningful adversarial testing.  The court noted that the

7    physical and psychological environment that yielded a confession can be of substantial relevance to

8    the ultimate factual issue of a defendant's guilt or innocence.  *Id*. at  688-689.

9    **B.     The Introduction Of Testimony To Show That The "Confession Was Unworthy Of Belief Was All But Indispensable To The Success Of Petitioner's Defense.**

10
11        Petitioner's entire defense was that there was no physical evidence to link her to the crime

   and that her admission of guilt was not to be believed.  Except to tell the jury that the people who
12
   knew petitioner did not believe she committed this crime, trial counsel presented nothing to explain
13
   to the jury why and how someone would confess to a crime she did not commit.
14

15        Recognizing that "the one question every rational juror needs answered: If the defendant is

16    innocent, why did (s)he previously admit his(her) guilt?",  the *Crane* Court found that, "(e)ntirely

17    independent of any question of voluntariness, a defendant's case may stand or fall on his ability to

   convince the jury that the manner in which the confession was obtained casts doubt on its
18
   credibility." *Crane v. Kentucky*, 476 U.S. at 689.  The Court noted that where, as in the instant case,
19
   the defendant's entire defense was that there was no physical evidence to link her to the crime and
20
   that her earlier admission of guilt was not to be believed, the introduction of testimony to show that
21
   the confession was unworthy of belief, is "all but indispensable to the success of this defense."  *Id*.
22
   at 689.
23

24        In *United States v. Hall*, 93 F.3d 1337 (7th Cir. 1996), the Seventh Circuit found that evidence

   of properly conducted social science research can show that the commonly held belief that a person
25
   will not confess to a murder she did not commit is in error.  It stated that this testimony would let
26
   the jury know of the phenomenon of false confessions, how to recognize it, and how to decide
27
   whether it fit the facts of the case.
28

1    The only evidence linking petitioner to the homicide was her confession.  Trial counsel

2    attempted to counter this confession by putting petitioner on the stand to tell the jury the confession

3    was false, that she did not commit this crime, and calling friends and family to the witness stand to

4    tell the jury petitioner is not the kind of person who could have committed this crime.  None of this

5    answered the question probably foremost in the minds of the jurors, "why would someone admit to

6    a murder she did not commit."

7    Trial counsel had retained Dr. Richard Ofshe as a social psychologist expert in the field of

8    coercive police interrogation techniques and the phenomenon of false or coerced confessions to

9    interview petitioner.  Dr. Ofshe had been on the faculty of the University of California at Berkeley

10   since 1962, had a Ph.D. in psychology from Stanford University, and had published widely.  He had

11   also worked extensively both with law enforcement officials and with defense counsel.

12   Dr. Ofshe reported to defense counsel that petitioner's "confession was not the product of

13   psychologically coercive interrogation tactics."  See, Exhibit B, Letter from Dr. Ofshe to Trial

14   Counsel [March 24, 2003].  However, he went on to state:

15          Ms. Lunbery maintains that she is not responsible for her former husband's
       death and essentially explains her decision to confess as a reaction to the stress of the
16     interrogation in combination with the pressures of the day on which Detective visited
       her.  Ms. Lunbery is describing a well recognized type of confession - a stress
17     compliant false confession.

18          This type of false confession comes about when persons who are
       exceptionally vulnerable to interpersonal pressure and are unable to cope with the
19     intensity of even a non-coercive interrogation are put in a position from which it
       appears to them that the only way to end the intolerable pressure they are
20     experiencing is to comply with the interrogator's demand for a confession.
       Typically, persons who are so exceedingly vulnerable to interrogative pressure simply
21     don't think about the long term consequences of compliance or they rationalize their
       decision to confess by adopting the position that since they are innocent of the crime,
22     the truth will come out.

23   *Ibid*.

24   Dr. Ofshe urged trial counsel to have petitioner evaluated by a competent clinical

25   psychologist who is familiar with this phenomenon.  *Ibid.*  He went on to state:

26          I should mention that given what I know of the case facts, it does not appear
       that Ms. Lunbery revealed any verifiable information about the crime that suggested
27     that she had actual knowledge of how her former husband was killed, nor does her
       confession present a particularly plausible account of the crime.  The failure of a
28     confession to fit the facts of a crime and the inability of a confessor to supply

14

information that should be known to the perpetrator is a hallmark of a false confession.

*Ibid*.

After receiving this report, and talking to Dr. Ofshe on the telephone, trial counsel put a note in the file stating that he spoke to Dr. Ofshe regarding a date to testify at the trial, "November 5[th] all day."  See Exhibit C, Memo Regarding Kristi Lunbery - September 2, 2003.  It was noted that they discussed "[Ofshe's] testimony, costs, travel, and what other information [Ofshe] would need to confirm his opinion that Kristi had lied to Grashoff in December, 2001."  *Ibid*.  Trail counsel stated he was advised by Dr. Ofshe to retain the services of a psychologist to administer the "Gudjonsson test," which measures a subject's interrogative suggestibility or "how vulnerable Kristi would have been to be pressured by Grashoff to admit killing her husband Charlie."  *Ibid*.  Trial counsel admitted he was unfamiliar with this test.  *Ibid*.

Instead of retaining the services of a psychologist who was familiar with the psychological tests relating to the giving of false confessions, defense counsel retained local psychologists who were unfamiliar with this area of psychology.

Trial counsel first contacted one psychologist who stated he was unaware of the test, but that he would call Dr. Ofshe.  Another local psychologist, contacted by trial counsel, said he knew of this test, but had never administered it nor knew of anyone who had.  He went on to tell trial counsel that "even if the test were (sic) valid and Kristi scored among those considered at risk to be easily manipulated he would need additional corroboration to support any conclusion that Kristi was vulnerable to manipulation techniques."  *Ibid*.

Trial counsel went on to state in this memo, that he had spoken to Kristi and her mother several times, and specifically asked about Kristi's history to which they reported there was no prior incidences of manipulative vulnerability.  *Ibid*.  He concluded however, that he arranged for Dr. Ofshe to testify at the trial, and that he had requested the local psychologist to research the issue of testing Kristi regarding her vulnerability to manipulation.  *Ibid*.

However, trial counsel then went on to conclude:

for several reasons such testimony would not be admissible in the fact of a Kelly-Frye objection.  Firstly, the "Gudjonsson test" is not widely accepted in the medical

1    community. Dr. Ofshe stated that he believed Kristi when she said she didn't kill her
     husband; but it would be the first case of its nature testified to in a US courtroom
2    based on "Gudjonsson test."  The reliability of any data used to form opinions
     regarding test results would be no corroboration historically to Kristi's case.  Dr.
3    Ofshe was provided with police reports, transcripts and audio tapes of Kristi's
     statement and met with her in Berkeley for an interview.  He wrote a report and has
4    been paid $3,750.00 to date and has requested another $2,750.00 for preparation and
     testifying on November 5, 2003.

5
           I have discussed all of these details and evidentiary issues with my co-counsel
6    Jeff Gorder and we both have concluded that at this juncture there is dramatically
     insufficient basis for Dr. Ofshe's testimony.  We have also considered the negative
7    impact an expert can have when his testimony is so lacking in substance.  As Dr.
     Caruso put it: "Kristi's best defense would be her explanation, the jury needs to
8    believe Kristi."

9    *Ibid.*[1]

10         Dr. Ofshe was not called to testify.

11         In response to a letter written by petition, in which he was made aware of her conviction, he

12   wrote petitioner a letter stating he "knew that (her) situation was very bad after we spoke but I also

13   knew that what you described is something that is reported in the literature and so is not at all

14   unknown."  See Exhibit E, Letter from Dr. Ofshe to Petitioner, February 4, 2005.  Dr. Ofshe stated

15   that he had anticipated that he would be testify at her trial, but had not heard from her trial lawyer.

16   He said that at the point he expected trial would be starting he called the trial lawyer, and learned that

17   the trial was underway and that he would not be called to testify.  *Ibid*.  He went on to say he was

18   never asked whether he would testify if no funding was available, and that had he been so asked and

19   was told there was no funding for his expertise, he would have come at his own expense and waive

20   his fee.[2]  *Ibid.*

21   _____

22   [1]In June, 2006, habeas counsel and her associate went to Redding, California to conduct
     investigation.  She called Jeffrey Jens, who stated he was not available for a meeting, but that he
23   could discuss this case over the telephone.  He stated the decision to not call Dr. Ofshe as a witness
     was made by his associate Jeffrey Gorder, but added he agreed with the decision.  Habeas counsel
24   and her associate then met with Jeffrey Gorder.  Mr. Gorder stated that he was not involved in
     making the decision to not call Dr. Ofshe as a witness at petitioner's trial.  He stated that by the time
25   he got assigned to the case, the decision not to call Dr. Ofshe was made by Mr. Jens.  See Exhibit
26   D, Declaration of habeas counsel, Juliana Drous.

27
     [2]Dr. Ofshe has requested no payment for the assistance he has provided habeas counsel.  See,
28   Exhibit D.

Dr. Ofshe has provided a declaration which outlines what he could have, and should have, been called to testify to at petitioner's trial. See, Exhibit F, Declaration of Dr. Richard Ofshe, Ph.D. In this declaration Dr. Ofshe explains:

> The phenomenon of psychologically induced false confession appears to many as counter-intuitive, if not completely irrational, and therefore beyond common knowledge and understanding. It is widely believed that adults do not offer false confessions short of being tortured or absent being either mental ill or mentally retarded. ... Therefore, most individuals find it hard to accept that normal persons, such as themselves, sometimes offer false confession to serious felony crime in response to purely psychological methods of interrogation. Contrary to the common perception, social science research over the past twenty years has documented hundreds of police-induced false confessions in America. While researchers do not know precisely how often police-induced false confessions happen, there is not longer any dispute about the fact that they occur with troubling regularity and they often lead to the wrongful prosecution, conviction and incarceration of factually innocent persons.

*Ibid.*

Dr. Ofshe notes that:

> Interrogation is intended to be an unpleasant and stressful experience that pressures a suspect to confess. Because police expect the suspect to be guilty and to deny his guilt, interrogation is designed to break down the suspect's resistence and thereby move him to admission. Police typically overcome a suspect's resistence by accusing the suspect of committing the crime, attacking the suspect's alibi, cutting of a suspect's denials and confronting the suspect with seemingly irrefutable (whether real or non-existent) evidence of his guilt. The point of these techniques is to shatter a suspect's confidence that his denials will protect him from a bad outcome to the session by convincing him that he is caught and that neither the interrogator, nor the prosecutor, nor the judge nor the jury that will judge him will believe his assertions of innocence. The interrogator takes the position that the objective evidence of the suspect's guilt is overwhelming that will inevitably lead to his arrest and conviction - regardless of what he says or does during interrogation.
>
> To elicit an admission or confession, however, it is often not sufficient simply to break down a suspect's resistence. Interrogators also try to persuade the suspect that given the circumstance in which he now finds himself - that he is caught, all the evidence is against him, and there is no way out of his predicament - there are positive reasons for confessing that will improve his otherwise hopeless situation. ...

*Ibid.*

Dr. Ofshe then explains:

> Certain types of individuals are far more vulnerable to the pressures of interrogation and therefore more likely to give a false confession. ... This also included individuals with a low IQ or low-level cognitive functioning, who may be more vulnerable to interrogation because of their inability to understand the nature or the gravity of their situation, their inability to foresee the consequences of their actions, their inability to cope with stressful situations and/or their eagerness to please others, especially authority figures. ...This also includes individuals whose

17

1

personalities make them highly suggestible, and/or highly compliant and who are therefore predisposed to believe that they have no choice but to comply with the demands of authorities or persons who simply lack the psychological resources to resist the escalating pressures of accusatorial interrogation.

2

3

Normal persons who happen to be exceptionally responsive to the pressures of interrogation are at risk of giving a false confession due to their unusual weakness. This condition is known as Interrogative suggestibility and is defined as "the extent to which, within a closed social interaction, people come to accept messages communicated during formal questions, as the result of which their subsequent behavioral response is affected."[3] ...

4

5

6

7    *Ibid*.

8    Dr. Ofshe further explained:

9

A police-induced false confession may be caused by a suspect's pre-existing interrogative suggestibility in combination with the stresses and pressures of even a proper, non-coercive interrogation. There are two types of police interrogation induced false confessions. The first is (1) a *compliant* false confession (a false confession knowingly given to put an end to the interrogation or to receive an anticipated benefit or reward in exchange for confession); and (2) a *persuaded* false confession (a confession given by a suspect who has come to doubt the reliability of his memory and thus has come to believe that he may have committed the crime at issue despite having no actual memory of having done so.) These types of false confessions typically involve different types of police pressures and different tactics of interrogation. Regardless, false confessors who offer either type of confession typically recant their confessions shortly after they are removed from the pressures and reinforcements of the interrogation environment.

10

11

12

13

14

15

16    *Ibid.*

17    Dr. Ofshe interviewed petitioner on March 4, 2003. As noted above, she maintained she was

18   not responsible for the death of her former husband, and explained she confessed as a reaction to the

19   stress of the interrogation in combination with the pressures of the day she was interviewed by

20   Deputy Grashoff. Dr. Ofshe reported that petitioner described a well recognized type of confession -

21   a stress compliant false confession. *Ibid*. Dr. Ofshe states that had petitioner been administered the

22   Gudjonsson test and scored high, he would have testified about false confessions, explaining why

23   they occur, and how to evaluate them. *Ibid*.

24    Prior to the filing of this petition, petitioner was evaluated by a competent psychologist, Paul

25   Good, Ph.D., who is familiar with the use of the Gudjonsson test as a diagnostic instrument for the

26

27

28    [3]Gudjonsson, G.H. & Clark, N.K. (1986) Suggestibility in police interrogation: a social psychological model. *Social Behavior*, 1, 83-104.

18

phenomenon of interrogative suggestibility.  See, Exhibit G, Declaration of Paul Good, Ph. D.  Dr. Good reports that "(p)sychological testing found Ms. Lunbery to be cooperative and motivated to do her best." *Ibid*.  Her score on the Rey Memorization Test "suggests that it is unlikely that she is attempting to grossly malinger any cognitive symptoms." *Ibid.*  Her score on the WASI yielded a Full Scale IQ of 94, which falls at the 34th percentile rank in the average range of adult intelligence. However, her verbal skills were somewhat higher than measures of abstract reasoning and visual spatial analysis. *Ibid.*

Dr. Good further reports:

> Behaviorally, Ms. Lunbery is likely to be immature, passive, and lacking vitality. Interpersonally, she has few close relationships and in those she does have she is often submissive, preferring to subordinate her needs to a stronger, nurturing figure. Cognitively, it is likely that her thought processes are impoverished and Mr. Lunbery is somewhat naive, easily persuaded and gullible. ... Ms. Lunbery's self-image is likely to be weak, complacent and inadequate.  Her inner life is somewhat unsophisticated and incomplete.

*Ibid.*

Dr. Good goes on to describe the Gudjonsson Compliance Scale as a "test that defines compliance in terms of an eagerness to please, an avoidance of conflict and confrontation, and obedience to authority." *Ibid*.  On this test, petitioner obtained a score of 19, which is nearly 3 standard deviations above the mean of 9.0 for normal adults in the general population, and falls above the 95th percentile rank.

> Her very high score is also about one standard deviation above the mean (14.3) for alleged false confessors. For example, Ms. Lunbery reports that she gives in easily when pressured, is concerned what people think of her, becomes frightened in the company of people in authority, when uncertain tends to accept what people tell her, is inclined to go along with what people tell her even when she knows they are wrong, is an obedient person, finds it difficult to disagree with others, is a person who avoids confrontation, and tries to please others.  Thus, Ms. Lunbery is a person who is likely to be very sensitive to the verbal and non-verbal cues given to her by authorities, to acquiesce to the wishes of authority figures, and to do what she is told.

*Ibid*.

The Gudjonsson Suggestibility Scale (GSS-1) is a measure of interrogative suggestibility. This scale helps identify people who are susceptible to giving erroneous accounts of events when subject to questioning.  On this scale, petitioner received a total suggestibility score of 6, slightly below the mean (7.5) for adults in the general population, and falling at approximately the 41st

percentile rank. "This indicates that she was not highly suggestible in the testing situation." *Ibid*.

Dr. Good concludes that, taking all of the data into account, petitioner has the personality features that made her vulnerable to giving a false confession. First, petitioner's psychological history indicates she "is a conventional, somewhat naive and conflict-adverse person." *Ibid*. Dr. Good reports that the psychological testing data is consistent with petitioner's psychological history. He states:

> Ms. Lunbery has a dependent profile in which she adopts a passive role, subordinates herself in relationship to others, and is uncomfortable with confrontation. Although she is of average intelligence, she is anxious about asserting herself and tend to acquiesce. This shy and reserved woman does not trust her own feelings and judgment. Furthermore, Ms. Lunbery has poor ego strength, meaning that she is not good at tolerating stress and frustration and her coping skills are limited.

*Ibid*.

Dr. Good goes on to note the fact that petitioner's score on the Gudjonsson Compliance Scale was extremely high, while only average of the Gudjonsson Suggestibility Scale and explains:

> Ms. Lunbery described herself as being very compliant and obedient to authority, but in the GSS test paradigm she scored only average in suggestibility. Despite leading questions and negative feedback, she did not shift a significant number of her responses on the GSS. Because the amount of variance that these variables share in common is small, only about 20%, it is possible that a person can be compliant but not necessary suggestible, and vice versa.

*Ibid.*

Dr. Good concludes:

> In light of the Gudjonsson data, I believe two factors need to be considered with respect to Ms. Lunbery's claim that she falsely confessed to Detectives Grashoff and Blankenship. First, the psychological coercion of the detectives was far stronger than the interrogative pressure created in the GSS test situation. Ms. Lunbery may not have been suggestible in the test situation because the coercion of the test paradigm was not strong enough to change or shift her responses. Second, Ms. Lunbery learned quite painfully the consequences of her compliance with the detectives, namely being convicted and sent to state prison. They may have caused her to become more resistant to the interrogative pressure of the testing situation with me, and thus she stood by her judgments and did not change her answers after leading questions and negative feedback.

> Looking at the totality of the data from Ms. Lunbery's personality assessment, it is my opinion that she was vulnerable to giving a false confession. The history and psychological testing reveal a person who needs to seek refuge in the authority of a stronger figure, who needs constant affection and validation, and therefore is at risk for doing things she doesn't want to do and going along with requests and instructions for some immediate gain. Further, her limited coping skills would leave her with few option for contending with the demands of powerful authorities.

*Ibid.*

Once it was decided that evidence of petitioner's confession would be admitted at jury trial, the jury was entitled to hear relevant evidence on the issue of its credibility and the trial judge should have instructed the jury to give such weight to the confession as the jury feels it deserves under all the circumstances. It was certainly within the jury's province to assess the truthfulness and accuracy of the confession. See *United States v. Hall*, 93 F.3d at 1345.

As was recognized by the federal appellate court in *Hall*, "it is a commonly held belief that people do not confess to murders they do not commit. Even though the jury may have had beliefs about the subject, the question is whether those beliefs were correct." *Id.* at 1345. Properly conducted social science research often shows that commonly held beliefs are in error. Dr. Ofshe's testimony would have let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fit the facts of the case being tried. *Ibid*.

It would have been up to the jury to decide how much weight to attach to Dr. Ofshe's theory, and to decide whether they believed his explanation of petitioner's behavior or the more commonplace explanation that the confession was true. Dr. Ofshe's testimony would have gone to the heart of petitioner's defense. The jury here was deprived of critical information it should have had in evaluating petitioner's case. *United States v. Hall*, 93 F.3d at 1345.

**C.    Trial Counsel Rendered Ineffective Assistance Of Counsel When He Failed To Present Expert Testimony To Rebut The Assumption That An Innocent Person Will Not Confess To A Crime She Did Not Commit.**

Petitioner received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution. Due to counsel's inadequate performance, there is a reasonable probability, sufficient to undermine confidence in the outcome of trial, that had counsel performed reasonably, petitioner would not have been convicted.

The criteria for analyzing a claim of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668. *Strickland* requires a defendant to demonstrate two elements: (1) counsel's performance was deficient (i.e., counsel was not functioning as counsel guaranteed the defendant by the Sixth Amendment), and (2) counsel's deficient performance prejudiced the defense (i.e., deprived the defendant of a fair trial rendering the outcome of the trial unreliable). *Id*. at 687-

21

688.  To establish that the attorney was not performing within the range of competence demanded of attorneys in criminal cases, a defendant must demonstrate the attorney's representation fell below an objective standard of reasonableness.  *Ibid.*

Dr. Ofshe would have testified experts in the field agree that false confessions exist, that individuals can be led into giving false confessions, and that there exist individuals who are likely to make a false confession.  Had trial counsel followed through, and retained a psychologist to conduct the necessary examination, testimony could have been presented in petitioner's defense explaining that people do confess to murders they do not commit, and that petitioner was such a person.

Counsel's representation fell below an objective standard of reasonableness for failing to follow through and retain the services of a  competent psychologist to conduct the necessary examination and failing to present testimony regarding the subject of "false confessions" by Dr. Ofshe at petitioner's trial.  Dr, Ofshe could "have helped the jury understand that what (petitioner was) describing is something that is well recognized by those who study interrogation and false confession.  (He) could have helped (the jury) understand that since false confessions happen and happen for the reasons (petitioner) gave, (the jury) needed to get past the fact that (she) said 'I did it' and look at the evidence and (her) lack of knowledge of how the crime happened.  This is how (the jury) needed to weigh (petitioner's confession) and to decide whether it was a true or false statement." See, *United States v. Hall*, 93 F.3d at 1345.  Trial counsel presented to the jury no information with which they could properly weigh the confession and make a determination of their own as to whether  it was a true or false statement.

Had counsel followed through on Dr. Ofshe's recommendation that  further testing be administered on petitioner, to assist in determining the reliability of her "confession," and called upon Dr. Ofshe to testify at petitioner's trial, counsel could have effectively attacked the commonly held belief that people do not confess to murders they did not commit.  Trial counsel's representation fell below an objective standard of reasonableness in failing to challenge the confession as false.

Evidence explaining why petitioner confessed to a crime she did not commit was all but indispensable to any chance of a  successful defense.  The failure of trial counsel to put this evidence

22

1   before petitioner's jury via the testimony of Richard Ofshe, Ph.d., deprived petitioner of the only

2   defense she had.

3          Petitioner was prejudiced by counsel's deficient performance. As previously noted, there was

4   no evidence connecting petitioner to the killing of her husband other than her confession. The

5   prosecutor's entire case and closing argument was focused on the confession. Had trial counsel

6   effectively represented petitioner at her trial by presenting evidence regarding the occurrence of false

7   confessions, the jury would have had the necessary information to properly weigh the confession and

8   to make a determination of their own as to whether it was a true or false statement. See *United*

9   *States v. Hall*, 93 F.3d at 1345.

10         Counsel's errors were so serious as to deprive the petitioner "of a fair trial, a trial whose result

11  is reliable." *Strickland*, 466 U.S. at 687. Petitioner was denied her Sixth and Fourteenth

12  Amendment right to the effective assistance of counsel, and a fair trial. The judgement should be

13  reversed.

14  **II.   DENIAL OF THE RIGHT TO PRESENT EVIDENCE OF THIRD PARTY
        CULPABILITY WAS AN ABRIDGMENT OF PETITIONER'S SIXTH
15      AMENDMENT RIGHT TO PRESENT A DEFENSE**

16  _____Petitioner offered to prove, inter alia, that a drug dealer named Delgado formerly resided in

17  the Fir Street residence, and had been evicted by petitioner's grandmother just before petitioner and

18  Bateson moved in. A Ford Fiesta which had connections to both Delgado and a man named Garza

19  had been seen in front of the residence a week before the homicide, and briefly parked there again

20  in the very early hours of the day of the homicide. Delgado was known to have burned Garza in a

21  drug deal. After the homicide, Garza (who was now dead) was overheard saying, "That is a bummer.

22  My partner blew away the wrong dude." (RT 159-164.)

23         The court, concluding this all related to motive alone, and that Garza's post-homicide

24  statement was hearsay, granted the district attorney's motion to exclude evidence of third party

25  culpability. (RT 171-175, 191-192.) Petitioner's counsel also referred to the unidentified prints

26  found in the residence, which the court concluded had no probative value. (RT 162, 178.)

27  _____"The Constitution guarantees criminal defendants 'a meaningful opportunity to present a

28  complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *California v. Trombetta*, 467 U.S.

479, 485 (1984).  A criminal defendant has a constitutional right to present all relevant evidence of significant probative value in her favor.  To exclude testimony relevant and vital to the defense is a violation of the Sixth and Fourteenth Amendments.  *Washington v. Texas*, 388 U.S. 14 (1967). Defendants have "the right to put before the jury evidence that might influence the determination of guilty."  *Pennsylvania v. Ritchie*,  480 U.S. 39 (1987).

The trial court's ruling violated petitioner's Sixth Amendment fundamental right to present a defense.  Such error, is tested by the *Chapman* standard - - whether the error was harmless beyond a reasonable doubt.  *Delaware v. Van Arsdall*, 475 U.S. 673 (1986); *Chapman v. California*, 386 U.S. 824 (1967).

It is clear that the error was prejudicial.  The only evidence of guilt was the questionable confession.  For nine years, the case was too flimsy to even proceed to prosecution.  Only after two police officers obtained a confession containing no information not generally known, from a woman known to be passive and nonaggressive, with no history of violence, was this case prosecuted.

Petitioner is, for many reasons, an improbable killer.  On the day of the homicide, no blood was found on her or in her car, and there was no evidence of a clean-up attempt (RT 312), although blood splattered throughout the room in which her husband was killed, as well as on the door from which the fatal shot was fired.  (RT 316, 320, 329-330.)  Two children, one of whom was over three, were at home with petitioner, and she would have had to have shoot her husband in their presence. No one had noted any problems in the marriage.  In fact, the evidence showed that petitioner and her husband had been working towards their future in that they had just moved into a small house belonging to her grandmother, to save money to purchase a home.  There was no motive for the killing.

Had the jury learned that the former tenant of the residence was a drug dealer who had an enemy, and that enemy, after the shooting, commented that his partner blew away the wrong man, combined with the unidentified fingerprints found inside the residence, it cannot be said that the error was harmless beyond a reasonable doubt.

24

1    **III.    THE COURT ERRED IN FAILING TO IMPOSE REQUESTED SANCTIONS FOR
         THE STATE'S FAILURE TO PRESERVE THE IDENTITY OF A CONFIDENTIAL
2        INFORMANT WHO POSSESSED EXCULPATORY EVIDENCE**

3         When petitioner moved for disclosure of the identity of confidential informants (CT 73-85),

4    information pertaining to one such informant was turned over (CT 90), but as to the other, an

5    evidentiary hearing disclosed that the detective who interviewed that informant had no current

6    recollection of his or her identity, and that although the detective's practice was to record the

7    informant's name and address in a field notebook, he could no longer find that material.  (RT 13-15.)

8    Although the detective considered the information obtained to be important (RT 20), the court

9    concluded it was speculative, and denied a motion to dismiss the charges for loss of material

10   exculpatory evidence.  (RT 24, 27-28.)  When the motion was renewed at trial, petitioner requested

11   sanctions for failure to preserve the information.  (CT 201-202.)  Specifically, counsel requested that

12   he be allowed to introduce the informant's statement or that the jury be advised that the prosecution

13   failed to preserve identifying information regarding a confidential information regarding a

14   confidential informant who had information relevant to the defense that someone other than

15   petitioner killed Bateson.  (CT 202.)

16        The confidential informant had advised the detective, inter alia, that Bateson's death might

17   have been a mistake, that Frank Delgado was the intended victim, that Delgado had a number of

18   enemies (CT 80), that Delgado and Garza had been seen driving a Ford Fiesta (CT 80-81), and

19   offered a number of possible suspects, including Garza and his family.  (CT 81.)  Admittedly the

20   confidential informant was speculating, but his or her speculations were based on a substantial

21   amount of information he or she had, which was crucial to petitioner's attempts to establish third

22   party culpability.  As indicated in Argument II, *ante*, that attempt was short-lived, as the court

23   concluded that the evidence was insufficient to establish same.  It is, to say the least, ironic that the

24   court by its ruling on this motion failed to recognize that the prosecution, by its failure to preserve

25   the identity information, had effectively prevented petitioner from developing the necessary

26   additional evidence to place third party culpability before the jury.  Thus, the court, by its ruling,

27   placed petitioner in the proverbial Catch 22.

28        The state lost evidence whose exculpatory value was obvious, and was known to the

25

detective who obtained it.  The confidential informant was crucial, and the State's failure to preserve the information concerning his or her identity was a violation of the State's duty. The very officer who lost his notes identifying the confidential informant recognized the importance of the information the informant provided.

The prosecution's loss of ability to identify the confidential informant violated petitioner's due process rights guaranteed by the Fourteenth Amendment and her Sixth Amendment right to a fair trial.  See, *Arizona v. Youngblood*, 488 U.S. 51 (1988); *California v. Trombetta*, 467 U.S. 479 (1984).

**IV.    THE COURT ERRED IN FAILING TO ADMONISH THE JURY FOLLOWING PROSECUTORIAL MISCONDUCT WHICH RESULTED IN A FUNDAMENTALLY UNFAIR TRIAL**

The defense offered by trial counsel was that petitioner's character rendered it extremely unlikely that she would have committed the offense (RT 1101-1107), that she had no reason to do so (RT 1107-1110), that there was no physical or scientific evidence linking her to it (RT 1113-1115), and, that her confession was false, coming as a result of coercion, pressure, and scare tactics by Deputy Sheriff Grashoff.  (RT 1128-1137.) Trial counsel's argument was substantially undercut when the prosecutor, told the jury, "You would never have heard that interview if it was a coercive interview." (RT 1082.)  The court refused petitioner's request for a curative admonition, suggesting instead that either the prosecutor or the defense attorney clarify the statement in argument.  (RT 1084, 1086.)

"The prosecution, as an integral part of the (court) system, has an unqualified responsibility to try its cases with fairness and integrity."  *People v. Daggett*, 225 Cal.App.3d 751, 759 (1990).  In *Berger v. United States*, 295 U.S. 78 (1935), the United States Supreme Court referred to the prosecutor's role in the following terms:

> He may prosecute with the earnestness and vigor - - indeed, he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id.* at 88.

Moreover, it is the duty of the judge to "control all proceedings during the trial and to limit

26

1  ... the argument of counsel to relevant and material matters." Cal. Pen. Code § 1044.  The function

2  of the court when an objection is made to argument as improper is to sustain the objection and cure

3  the misleading aspect of the argument by admonition to ignore same.  *People v. Bell*, 49 Cal.3d 502,

4  538 (1989); *People v. Pineiro*, 129 Cal.App.3d 915, 923 (1982); *People v. Butler*, 104 Cal.App.3d

5  868, 879 (1980).

6  It is improper for a prosecutor to mislead the jury by misstating the law.  *People v. Bell*, 49

7  Cal.3d at 538.  As any prosecutor must know, California Evidence Code section 405 only delineates

8  a voir dire procedure outside the presence of the jury to determine the admissibility of confessions.

9  *People v. Carroll*, 4 Cal.App.3d 52, 59 (1970).  This procedure has nothing to do with the issue of

10  the credibility of the confession.  Because questions of credibility, whether of a witness or of a

11  confession, are for the jury, the requirement that the court make a pretrial voluntariness

12  determination does not undercut the defendant's traditional prerogative to challenge the confession's

13  reliability during the course of the trial.  *Crane v. Kentucky*, 476 U.S. 683.  To argue that the jury

14  "would never have heard that interview if it was coercive," is both to misstate the law and to confuse

15  the jury concerning its role considering the presented evidence regarding the credibility of the

16  "confession."

17  Prosecutorial misconduct in argument violates the due process clauses of the Fifth and

18  Fourteenth Amendments when it "infect(s) the trial with unfairness."  *Donnelly v. DeChristoforo*,

19  416 U.S. 637, 642 (1974).  If a prosecutor's argument so misstates the law that there is a likelihood

20  the jury was confused about what it had to find in order to reach a verdict, a reversal is required.

21  The failure of the trial court to properly admonish the jury, resulted in the denial of

22  petitioner's Sixth Amendment right to a fair trial.  The statement that the interview could not be

23  found by the jury to be coercive, for if it was such, it would not have been allowed to be introduced,

24  so undercuts the jury's role that without an appropriate admonition, it cannot be said the error was

25  harmless beyond a reasonable doubt.  *Chapman v. California*, 386 U.S. 824.  The judgement should

26  be reversed.

27

28

**V.    THE TOTALITY OF THE CIRCUMSTANCES ESTABLISH THAT PETITIONER'S CONFESSION WAS INVOLUNTARY AND SHOULD HAVE BEEN SUPPRESSED**

The Fifth and Sixth Amendments to the federal Constitution bars the use of a defendant's involuntary confession.  Before a confession can be used by the prosecution, the district attorney must establish that defendant's confession was voluntary.  (*Lego v. Twomey*, 404 U.S. at 489.)  In the instant case, scrutiny of the totality of the circumstances surrounding petitioner's confession establishes that the confession was involuntary.

Grashoff readily admitted that he went to petitioner's residence, not to obtain additional information, but to secure a confession.  (RT 55.)  He spent approximately an hour, softening petitioner up by general questioning and review.  (CT 458-515.)  He then went on the offensive, accusing petitioner of inconsistency (CT 520), referring tan FBI profile indicating her guilt ("everything comes back to you, Kristi," [CT 521]), repeatedly telling her the officers knew she was guilty. (CT 521, 522, 524, 525), inferring she would get more lenient treatment if she confessed (CT 524), and implying that she would not lose her children if she confessed (CT 526).  Grashoff implied that if she confessed, she would not lose her children, but if she did not confess, "they're going to take you away from your kids." (CT 527.)  When she asked for the opportunity to speak to someone, Grashoff said, "you want to talk to somebody first, that's fine ... I feel real sorry for your kids."  (CT 527-528.)  It was at this point that petitioner responded, "yes" to the question "Did you shoot (Bateson)?"  Petitioner provided no information not previously known.  She adopted the officer's suggestion that the reason she killed her husband was that he was controlling (petitioner said, "like you said, ... controlling." (CT 522,529.)  She could provide no information as to what she had done with the weapon.  (CT 532.)

No single factor is dispositive in determining voluntariness, but rather courts consider the totality of the circumstances.  *Withrow v. Williams*, 507 U.S. 680, 693-694 (1993). If the police engage in a course of conduct which coerces a suspect into confessing, a finding of involuntariness can be made.  *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

In interviewing petitioner, the detectives repeatedly implied that she would get beneficial treatment if she told them what they wanted to hear, and if she refused, "it wouldn't be the same."

28

1    (CT 527.)  They made repeated threats to take her children away or that they would be negatively

2    impacted by her refusal to confess.  She was also told that her repeated requests to speak to someone

3    demonstrated her guilt.  The totality of the methods used by the interrogating officers rendered the

4    ensuing confession involuntary, and thus inadmissible.

5         To determine whether the improper admission of a confession was prejudicial is assessed

6    under the standard of *Chapman v. California*, 386 U.S. at 24.  *Arizona v. Fulminante*, 499 U.S. 279,

7    307-309 (1991).  The inquiry to determine whether or not the admission of the confession was

8    harmless is whether "the guilty verdict actually rendered in this trial was surely unattributable to the

9    error."  *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993).

10        In the instant case, other than petitioner's confession, there is a total absence of evidence

11   linking petitioner to the crime.   Under the circumstances of this case, the erroneous admission of

12   the involuntary confession cannot be deemed harmless error.

13                                    **CONCLUSION**

14        For the foregoing reasons, petitioner's confinement pursuant to her conviction in the Shasta

15   County Superior Court is illegal, and a writ of habeas corpus should issue.

16   Dated: April 27,2007              Respectfully submitted,

17                              _____/s/_____

18                              JULIANA DROUS
                                Attorney for Petitioner
                                KRISTI LYN LUNBERY
19

20

21

22

23

24

25

26

27

28

                                        29

1

## DECLARATION OF SERVICE BY MAIL

2

Re:   In re Kristi Lyn Lunbery                                    B162132

3

        I, JULIANA DROUS, declare that I am over 18 years of age and not a party
to the within cause; my business address is 214 Duboce Avenue, San Francisco, California

4

94103. I served a true copy of the attached: PETITION FOR WRIT OF HABEAS CORPUS
on the following, by placing same in an envelope addressed as follows:

5

6

Attorney General for the
State of California
P.O. Box 944255

7

Sacramento, CA  94244-2550

8

Clerk, Shasta County Superior Court
1500 Court Street

9

Redding, CA 96001

10

Kristi Lyn Lunbery X-05377
P.O. Box 92

11

Chowchilla, CA 93610-0092

12

        Said envelopes were then, on June 13, 2007, sealed and deposited in the United States
Mail at San Francisco, California, the county in which I am employed, with the postage

13

thereon fully prepaid.   I declare under penalty that the foregoing is true and correct.
Executed on June 13, 2007, at San Francisco, California.

14

                                    /s/
15                                  _____
                                    HEATHER HARDWICK

16

17

18

19

20

21

22

23

24

25

26

27

28